IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ASHLEY McDANIELS,
on her own behalf and on behalf of
all others similarly situated,

    *Plaintiff*,

    v.

WESTLAKE SERVICES, LLC,
d/b/a Westlake Financial Services, *et al.*,

    *Defendants*.

Civil Action No. ELH-11-1837

## MEMORANDUM OPINION

This case presents itself in an unusual procedural posture, because it concerns the plaintiff's motion to vacate a class action settlement agreement that was preliminarily approved.

In July 2011, plaintiff Ashley McDaniels filed a class action suit against Westlake Services, LLC, doing business as Westlake Financial Services ("Westlake"), defendant.[1] Westlake was plaintiff's creditor with respect to a Retail Installment Sale Contract that Ms. McDaniels executed to finance the purchase of a motor vehicle. Ms. McDaniels contended that Westlake unlawfully charged her convenience fees and interest at a rate in excess of the maximum rate permitted by Maryland law, and unlawfully repossessed her motor vehicle, all in violation of the Credit Grantor Closed End Credit Provisions ("CLEC") of the Maryland Credit Deregulation Act of 1983, codified, as amended, at Md. Code (2005 Repl. Vol., 2012 Supp.),

---

[1] Plaintiff also named the Law Offices of William R. Feldman, P.C. ("Feldman") as a defendant, but her claims against Feldman were settled and dismissed shortly after suit was filed. *See* ECF 10 (notice of settlement) & ECF 11 (dismissal order).

§§ 12-1001 *et seq.* of the Commercial Law Article ("C.L.").[2]  Her complaint (ECF 1) contained

five counts directed against Westlake: violation of CLEC (Count I); breach of contract (Count

II); violation of the Maryland Consumer Protection Act ("CPA"), C.L. §§ 13-101 *et seq.* (Count

III); restitution and unjust enrichment (Count IV); and violation of the Maryland Consumer Debt

Collection Act ("MCDCA"), C.L. §§ 14-201 (Count V).[3]

Plaintiff proposed to conduct the case as a class action,[4] on behalf of two defined classes:

a "Repossession Class," consisting of all persons whose consumer goods were repossessed by

---

[2] The acronym "CLEC" stands for "CLosed End Credit," and contrasts with "OPEC" (*i.e.*, "OPen End Credit"), which is regulated by the Credit Grantor Revolving Credit Provisions of the Credit Deregulation Act, codified as amended at C.L. §§ 12-901 *et seq.*  *See, e.g.*, *Taylor v. Friedman*, 344 Md. 572, 579, 689 A.2d 59, 62 (1997).

[3] The MCDCA count was directed at both Westlake and Feldman.  All of the other counts listed above were directed solely at Westlake.  Although the MCDCA count was denominated as "Count Five," it was actually the sixth count in the complaint.  Another count, also denominated "Count Five," was directed solely at Feldman, and alleged violation of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*  As noted, plaintiff's claims against Feldman were dismissed, so the FDCPA count is no longer at issue.

[4] Plaintiff asserted original subject matter jurisdiction on the basis of diversity of citizenship under the Class Action Fairness Act of 2005 ("CAFA"), codified in relevant part at 28 U.S.C. § 1332(d), as well as the FDCPA's grant of subject matter jurisdiction, *see* 15 U.S.C. § 1692k(d).  *See* Complaint ¶ 21.  In addition, she asserted supplemental jurisdiction as to her state law claims under 28 U.S.C. § 1367.  *See* Complaint ¶ 22.  (Plaintiff also cited 28 U.S.C. §§ 1441, 1446, and 1453, *see* Complaint ¶ 21, but those statutes are inapplicable because they govern removal jurisdiction, and this case was originally filed in this court; it was not removed from state court.)

CAFA grants subject matter jurisdiction to the district courts over certain class actions, including ones in which the aggregate amount in controversy exceeds $5 million, the aggregate number of members of the plaintiff classes is 100 or more, and any member of the plaintiff classes is a citizen of a state different from any defendant.  *See* 28 U.S.C. § 1332(d)(2)(A), (5)(B).  There are certain mandatory and discretionary exceptions to CAFA jurisdiction, several of which carve out class actions that, for various reasons, are local in focus, despite otherwise meeting the foregoing jurisdictional requirements.  *See, e.g.*, 28 U.S.C. § 1332(d)(3)-(4).

Plaintiff's complaint does not make clear that the jurisdictional requirements of CAFA are satisfied.  In particular, the complaint does not expressly allege that the aggregate number of

Westlake in connection with a credit contract governed by CLEC; and an "Interest Rate/Fee Class," consisting of all persons who entered into a credit contract with Westlake that was governed by CLEC and who were charged either (1) interest at a rate exceeding 24%, or (2) a convenience fee.[5]

Soon after the complaint was filed, the parties jointly requested an expedited settlement conference and a stay of further proceedings pending a settlement conference. *See* ECF 8. The Court granted their request, *see* ECF 9, and a settlement conference was conducted by a magistrate judge in October 2011. Settlement negotiations were fruitful and, on January 31, 2012, plaintiff filed a motion for preliminary approval of a class-wide settlement. *See* ECF 14. On February 6, 2012, Judge Benson E. Legg, to whom the case was then assigned, issued an "Order Preliminarily Approving Settlement, Certifying Classes for Settlement Purposes, Appointing Class Counsel and Settlement Administrator, and Setting Schedule with Respect to Notice, Settlement Hearing and Administration" ("Preliminary Approval Order") (ECF 15). Among other things, the Preliminary Approval Order preliminarily approved the parties' settlement agreement as "fair, reasonable and adequate, subject to further consideration thereof at

---

class members exceeds 99 or that the aggregate amount in controversy exceeds $5 million. And, even if this case otherwise satisfies CAFA's jurisdictional requirements, it appears that there is more than a remote possibility that one of the exceptions to CAFA jurisdiction could apply.

Nevertheless, it is clear that jurisdiction under the FDCPA was proper at the inception of the suit and that, accordingly, the court has supplemental jurisdiction over plaintiff's state law claims. *See* 28 U.S.C. § 1367(a). And, although the FDCPA claim has since been dismissed, the court has discretion to retain supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c). In the exercise of that discretion, I see no reason to decline to exercise jurisdiction. Accordingly, the Court is assured of its subject matter jurisdiction under 28 U.S.C. § 1367.

[5] In the complaint, plaintiff referred to the Interest Rate/Fee Class as the "Usury Class," but subsequent filings by both parties have used the less loaded phraseology. The FDCPA and MCDCA claims were brought only by Ms. McDaniels individually, and not on behalf of either proposed class.

[a] Fairness Hearing" to be held on June 14, 2012; it preliminarily certified for settlement purposes both the Repossession Class and the Interest Rate/Fee Class, pursuant to Fed. R. Civ. P. 23(b)(3); and it made provisions for notice to class members and an opportunity to opt out of the class and proposed settlement. Preliminary Approval Order at 1-2, 4-5, 6.

One month before the fairness hearing was to occur, however, plaintiff filed a Motion to Vacate the Preliminary Approval Order ("Motion to Vacate") (ECF 20), on the ground that new information, which had come to light in the course of "confirmatory discovery" from Westlake, undermined the basis for the settlement agreement. Shortly thereafter, and on the same basis, plaintiff filed a Motion in Opposition to Final Settlement Approval ("Motion Against Final Approval") (ECF 22). Westlake opposed the Motion to Vacate, *see* ECF 25 & 30, and the Motion Against Final Approval, *see* ECF 27, and filed a Motion for Final Approval of Class-Action Settlement ("Motion for Final Approval") (ECF 26). The fairness hearing was postponed indefinitely, *see* ECF 33, and the motions were briefed.[6] However, before Judge Legg was able to rule on the motions, the case was reassigned to me on October 24, 2012, due to Judge Legg's then-impending retirement.

---

[6] Westlake's Opposition to the Motion Against Final Approval, *see* ECF 27, consisted of a "consolidated" memorandum identical to its memorandum in support of the Motion for Final Approval. *See* ECF 26-1. Plaintiff filed a Reply in support of the Motion to Vacate (ECF 34). Subsequently, Judge Legg requested further briefing from the parties as to certain issues, *see* ECF 35, which both parties supplied. *See* Westlake Supplemental Brief (ECF 39); Plaintiff Supplemental Brief (ECF 40). In addition, plaintiff filed two other motions that are listed as pending for decision—one for approval of a *cy pres* award (ECF 24), the other for approval of an incentive award to Ms. McDaniels as the named plaintiff (ECF 23)—both of which were filed as a contingency in case the Court granted the Motion for Final Approval over plaintiff's objections. Westlake opposed both motions, *see* ECF 28 & 29, but, by consent of the parties, the Court subsequently stayed briefing of those motions, as well as further briefing as to the issue of final approval, pending a ruling on the Motion to Vacate. *See* ECF 32 & 33. After the foregoing briefing was completed, plaintiff filed a Motion for Discovery (ECF 41), which the parties fully briefed, *see* ECF 44 & 45, but which Judge Legg later denied as moot. *See* ECF 46.

No hearing is necessary to resolve the matters at issue.  *See* Local Rule 105.6.  For the reasons that follow, I will deny all pending motions.

**Background**

A. CLEC

Although plaintiff asserted several claims against Westlake, only her claims under CLEC are relevant to the matters now at issue.  CLEC is one of several statutory schemes in Maryland that govern the extension of credit.  It applies to a loan if the lender affirmatively elects, in the "written . . . agreement, note, or other evidence of the loan," to be governed by CLEC's provisions, C.L. § 12-1013.1(a), in which case certain other Maryland credit regulating statutes do not apply.  *See* C.L. § 12-1013.1(b)(1) ("If a credit grantor elects in accordance with this section to make a loan under [CLEC], the provisions of Subtitle 1, 3, 4, 5, 6, or 9 of [Title 12 of the C.L. Article, which establish other credit regulating schemes] do not apply to the loan."); *Ford Motor Credit Co., LLC v. Roberson*, 420 Md. 649, 662, 25 A.3d 110, 118 (2011) (stating that "CLEC . . . enable[s] a creditor to unilaterally elect the legal framework for structuring a form contract to be offered to potential borrowers").

Among other things, CLEC limits the rate of interest that can be charged on a covered loan to an "effective rate of simple interest [that] is not in excess of 24 percent per year," C.L. § 12-1003(a); it limits the types and amount of fees that can be charged to a borrower, *see* C.L. § 12-1005; and it establishes notice and other detailed procedural requirements for the repossession and sale of collateral.  *See* C.L. § 12-1021.

Of import here, CLEC imposes a stringent penalty for violation of the statutory scheme: "Except for a bona fide error of computation, if a credit grantor violates any provision of [CLEC]

the credit grantor may collect only the principal amount of the loan and may not collect any interest, costs, fees, or other charges with respect to the loan." C.L. § 12-1018(a)(2). Moreover, if a credit grantor "knowingly" violates CLEC, the credit grantor is liable for treble damages. C.L. § 12-1018(b).

However, and also of import here, CLEC establishes a safe harbor for a credit grantor who promptly cures certain kinds of violations after receiving notice of the violations, including violations of the maximum interest rate provisions and fee provisions (although not the repossession provisions). *See* C.L. § 12-1018(a)(3)(i) (enumerating CLEC provisions subject to safe harbor). In the case of a failure to comply with the applicable provisions that is "[u]nintentional[ ] and in good faith," the penalty of forfeiture of all amounts other than principal does not apply, so long as the credit grantor "[c]orrects the error or violation and makes the borrower whole for all losses, including reasonable attorney's fees and interest, where appropriate, within 10 days after the credit grantor receives notice of the error or violation." C.L. § 12-1018(a)(3). Invocation of the safe harbor is an affirmative defense; the "burden [is] on the credit grantor to show that the credit grantor's failure to comply with [the applicable CLEC provisions] was unintentional and in good faith." C.L. § 12-1018(a)(4).

### B. Plaintiff's Claims and Initial Procedural History

According to plaintiff, in February 2009 she purchased a motor vehicle, primarily for personal, family, and household purposes, from a used car dealership in Baltimore, Maryland, financing the purchase by way of a Retail Installment Sale Contract ("RISC"). Complaint ¶¶ 30-32. The RISC, which was assigned to Westlake, contained an affirmative election to be

governed by CLEC. *Id.* ¶ 33.[7]  Nevertheless, Westlake charged Ms. McDaniels a 25% interest rate on the RISC, *id.* ¶ 36, as well as multiple "convenience fees" over the life of the loan. *Id.* ¶ 39.  At some point, Ms. McDaniels fell behind in her loan payments.  The motor vehicle was collateral for the loan and, in August 2010, Westlake or its agents repossessed the motor vehicle. *Id.* ¶ 40-42.  Thereafter, Westlake sent Ms. McDaniels a pre-sale notice informing her that the motor vehicle would be sold unless she redeemed it by paying the amounts past due on her loan. *Id.* ¶ 43.  However, the pre-sale notice did not state the location, date, or time at which the vehicle would be sold. *Id.* ¶¶ 44-46.  Westlake sold Ms. McDaniels' motor vehicle and subsequently sought unsuccessfully to collect a claimed deficiency balance from Ms. McDaniels. *Id.* ¶¶ 47-50.[8]

Ms. McDaniels initiated this suit on July 5, 2011, on her own behalf and on behalf of the Repossession Class and the Interest Rate/Fee Class.  As noted, she alleged that Westlake violated the CLEC by charging an excessive rate of interest; charging "convenience fees"; failing to provide notice of the location, date, and time of post-repossession sales; and failing to provide statutorily compliant post-sale notices of claimed deficiency.  Westlake was served with the complaint and summons on July 14, 2011.  *See* ECF 3.  At the parties' request, a magistrate judge conducted a settlement conference, which was held on October 5 and 6, 2011.  At least for a short time, the settlement negotiations were successful.  *See* ECF 14-2.

---

[7] Under CLEC, a "person who acquires or obtains the assignment of an agreement for an extension of credit made under [CLEC]," comes within the statutory definition of a "credit grantor" who is subject to CLEC's statutory obligations and potential penalties.  C.L. § 12-1001(g)(2)(iii).

[8] The date(s) and precise nature of Westlake's attempts to collect the deficiency balance are not fully alleged in the complaint and are not material to the matters at issue.

The parties achieved a proposed class-wide settlement, which was memorialized in a Settlement Agreement dated January 19, 2012 (ECF 14-2).  The Settlement Agreement proposed to resolve the claims of a total of 3,056 class members who "arguably fall within one or both of the Classes."  Settlement Agreement ¶ 11.A, at 3.  Of the total 3,056 class members, 219 accounts came within the Repossession Class, and 3,050 accounts came within the Interest Rate/Fee Class, having been charged either a convenience fee or interest in excess of 24%.  *See id.* ¶ 11.B-C, at 3.  Of the 3,050 accounts in the Interest Rate/Fee Class, 2,837 accounts had not undergone repossession, and thus were not members of the Repossession Class; the parties referred to these 2,837 accounts as the "Non-Repossession Accounts."  *Id.* ¶ 11.D, at 3.  Of the Non-Repossession Accounts, 147 accounts had been "charged off" by Westlake on or before July 22, 2011, and were referred to as the "Charged-Off Accounts."  *Id.* ¶ 11.E, at 3.  Westlake also asserted that the "obligors on at least 1,023 of the credit accounts identified as potentially within one or both Classes . . . could arguably have been excluded from the Classes due to legal defenses regarding arbitration clauses and statute of limitations."  *Id.* ¶ 11.F, at 3-4.

For the purpose of the pending motions, the parties agree that Westlake received notice of the alleged CLEC violations on July 14, 2011, the date that it was served with a copy of plaintiff's complaint and summons.  Thus, the parties also agree that, in order for Westlake to take advantage of CLEC's safe harbor defense, *see* C.L. § 12-1018(a)(3), it was required to "[c]orrect[ ] the error or violation and make[ ] the borrower[s] whole for all losses," *id.*, within ten days after July 14, 2011, *i.e.*, no later than July 24, 2011.  Hereafter, I will refer to the ten-day period between July 14 and July 24, 2011, as the "Cure Period."

The Settlement Agreement recounted that Westlake had taken several steps during the Cure Period to attempt to cure the alleged CLEC violations and thereby bring itself within CLEC's safe harbor. The Settlement Agreement stated, *id.* ¶ 11.G at 2, 4-6 (emphasis added):

> Westlake has <u>represented</u>, <u>and</u> [Ms. McDaniels] <u>relies upon such representation</u>, that:
>
>    *   *   *
>
> Within ten (10) days of receiving service of process in the Action, Westlake, on its own accord and in an attempt to cure any alleged violations of the CLEC asserted in the Complaint, took the following actions on or before July 22, 2011:
>
> 1. Westlake ceased using the allegedly defective pre-sale notice and post-sale accounting to cure the defects alleged in this Action.
>
> 2. Westlake ceased charging convenience fees to Maryland consumers that entered into a credit contract governed by CLEC.
>
> 3. Westlake ceased charging interest at a rate greater than twenty-four percent (24%) to Maryland consumers that entered into a credit contract governed by CLEC.
>
> 4. <u>Westlake waived all interest on Repossession Class credit accounts and credited all interest payments made, including the proceeds of the sale of collateral, to principal.</u> The total of such interest payments <u>re-classified to principal</u> and waivers of unpaid interest was approximately $416,415.
>
> 5. <u>Westlake also credited each Repossession Class credit account with six percent (6%) interest from the date of each interest payment that was reclassified as principal.</u> The total of the six-percent interest credited to Repossession Class credit accounts was approximately $197,835.
>
> 6. <u>Westlake waived all convenience fees charged to Repossession Class credit accounts, totaling $5,067, and reallocated those convenience fee payments toward principal.</u> Westlake also credited Repossession Class credit accounts with six percent (6%) interest from the date of each convenience fee payment that was reallocated, resulting in additional credits of $671.
>
> 7. In addition to the credits described in the preceding Sections . . . Westlake waived all outstanding balances and/or deficiencies that were owed in connection with the Repossession Class credit accounts. The total of the outstanding balances waived was approximately $453,304.

8. Westlake dismissed, with prejudice, any pending collection lawsuits against the Repossession Class obligors grounded upon an alleged deficiency or balance due with respect to any of those contracts.

9. Westlake also filed a request to vacate judgment in any case in which a judgment had been entered against any Repossession Class obligor.

10. Westlake mailed checks totaling $97,996.87 to Repossession Class obligors for overpayments by such obligors resulting from the above-described credits, reclassifications and waivers.

11. Westlake recalculated all of the Non-Repossession Accounts that exceeded twenty-four percent (24%) interest as if they were issued at 24%, which resulted in the reallocation of interest payments toward principal totaling approximately $377,280. This recalculation of the interest rate is also estimated to save Non-Repossession Account obligors an additional $400,000 in interest costs over the estimated life of the loans at July 22, 2011.

12. Westlake also credited all Non-Repossession Accounts with six percent (6%) interest from the date of each interest payment that was reclassified, resulting in additional credits totaling $25,637.

13. Westlake waived all convenience fees charged to Non-Repossession Accounts, totaling approximately $111,818, and reallocated those convenience fee payments toward principal.

14. Westlake also credited the Non-Repossession Accounts with six percent (6%) interest from the date of each convenience fee payment that was reallocated, resulting in additional credits of approximately $5,455.

15. Westlake mailed checks totaling $123,659.59 to obligors on the Non-Repossession Accounts for overpayments by such obligors resulting from the above-described credits, reclassifications and waivers.

16. Thus, the total amount of refund checks already issued to potential members of the Classes is approximately $221,656.

In addition to the foregoing relief, which Westlake represented it had performed during the Cure Period, the Settlement Agreement provided for the following relief for the classes: (1) it represented that, as of October 11, 2011, Westlake had waived all outstanding balances or deficiencies owed in connection with Charged-Off Accounts in the Interest Rate/Fee Class,

totaling $481,421 in waived balances; (2) it represented that Westlake had contacted the three major credit reporting agencies with respect to each of the accounts in the Repossession Class and the Charged-Off Accounts and "requested deletion of the trade lines relating to those credit accounts," and that Westlake would cooperate, within certain parameters, with any necessary further attempts by class members to delete properly a trade line from their credit reports; and (3) it provided that Westlake would pay the sum of $520,000 into a Settlement Fund, to be administered by a Settlement Administrator (the Casey Group, Ltd.), subject to a modest increase per additional class member if the classes were found to be more numerous than expected, and additional funds in the amount of any refund checks that Westlake had issued to class members during the Cure Period but that had not been negotiated. Settlement Agreement ¶¶ 22.P-R, 24.F, at 18-20, 22.

Out of the Settlement Fund, the parties agreed that attorney's fees and expenses for Class Counsel would be paid in an amount approved by the Court and not in excess of one third of the "Total Settlement Fund";[9] the Settlement Administrator would be reimbursed for costs of notice and administration; and an incentive award, proposed to be in the amount of $5,000, would be paid to Ms. McDaniels. *See* Settlement Agreement ¶¶ 23, 43, at 20, 29-30. After those deductions, the remaining amount of the Settlement Fund would be divided equally and distributed by check among the number of eligible accounts the obligors of which had not opted out of the classes. *Id.* ¶ 24.A, at 20-21. After 120 days had elapsed after distribution of the

---

[9] The "Total Settlement Fund" was defined as the sum of the Settlement Fund plus all amounts previously distributed to the potential class members as refunds for overpayments resulting from credits applied to the accounts by Westlake during the Cure Period. *See* Settlement Agreement ¶ 16(z), at 12.

checks, the amount of any checks that had not been negotiated would be distributed to a *cy pres* recipient, which the parties proposed would be Legal Aid Bureau, Inc. *See id.* ¶ 24.B-F.

Among other provisions, the Settlement Agreement also provided for "Confirmatory Discovery" by which Westlake would provide, within a certain time after the Court preliminarily approved the Settlement Agreement, a "sworn affidavit affirming the representations in [the] Settlement Agreement regarding actions taken by Westlake." Settlement Agreement ¶ 21. The Settlement Agreement provided three scenarios for termination of the agreement: (1) automatic termination if the Court failed to approve the Settlement Agreement; (2) termination at the option of either Ms. McDaniels or Westlake if the Court required material modification of the Settlement Agreement as a condition of approval; or, (3) termination at Westlake's option, if the obligors of 3% or more of the accounts eligible for class membership opted out of the classes. *See id.* ¶ 40. In addition, the Settlement Agreement stated: "If this Settlement Agreement is terminated or canceled, the Parties shall be deemed to have reverted to their respective status as of August 19, 2011, and they shall proceed in all respects as if this Settlement Agreement had not been executed and the related orders (other than the orders staying proceedings in the Action) had not been entered, preserving in that event all of their respective claims and defenses in this case" and plaintiff's right to file a new motion for class certification. *Id.* ¶ 41. Further, the Settlement Agreement provided: "All of the terms of this Settlement Agreement shall be governed by and interpreted in accordance with Maryland law." *Id.* ¶ 52.

On January 31, 2012, plaintiff filed her motion for preliminary approval of the Settlement Agreement. *See* ECF 14. Pursuant to the Preliminary Approval Order issued by the Court on February 6, 2012, and the terms of the Settlement Agreement, the Settlement Administrator

provided notice by mail to the potential class members. The potential class members had until May 6, 2012, to object to or opt out of the Settlement Agreement. In an affidavit submitted soon thereafter (ECF 21), an employee of the Settlement Administrator averred that, by the deadline, the Settlement Administrator had received one opt-out and no objections.[10]

On May 11, 2012, Westlake filed a Notice (ECF 17), in fulfillment of several requirements of the Settlement Agreement. The Notice stated that, on February 16, 2012, Westlake had paid $520,000 into the Settlement Fund held by the Settlement Administrator. In addition, the Notice recounted that, on May 11, 2012, Westlake had paid into the Settlement Fund an additional $48,248.32, representing the total value of uncashed refund checks that Westlake had issued to account holders during the Cure Period.

An affidavit of Michael Pavlin, who was Westlake's Senior Vice President for Operations during the Cure Period, was attached as Exhibit A to the Notice ("Pavlin Affidavit" or "Pavlin Aff.") (ECF 17-1). It was submitted in fulfillment of the Settlement Agreement's requirement that Westlake provide a "sworn affidavit affirming the representations in [the] Settlement Agreement regarding actions taken by Westlake." Settlement Agreement ¶ 21.

In the Pavlin Affidavit, Mr. Pavlin generally affirmed the representations as to Westlake's actions in the Settlement Agreement.[11] But, there was one conspicuous difference.

---

[10] Notices sent to the holders of a handful of the accounts were returned as undeliverable. However, of the 3,057 potential class member accounts, 2,993 received notice. *See* ECF 21 at 2.

[11] In addition, Mr. Pavlin noted that Westlake had "recently" discovered that it had "inadvertently" charged some convenience fees on CLEC loans after the Cure Period to two types of accounts: (1) accounts of consumers who did not live in Maryland but had entered into retail installment sales contracts governed by the Maryland CLEC, generally because the underlying purchase contract was with a Maryland automobile dealer; and (2) accounts that were paid off in full by a third-party (such as when a borrower traded in, toward the purchase of a new vehicle, a vehicle that was collateral for the borrower's Westlake account, and the dealer of the

Every remedial payment made by Westlake during the Cure Period that had been characterized in the Settlement Agreement as having been allocated "to principal" was characterized in the Pavlin Affidavit simply as a "credit." *Compare* Settlement Agreement ¶ 11.G.4 *with* Pavlin Aff. ¶ 3.D (waiver of interest payments on Repossession Class accounts); Settlement Agreement ¶ 11.G.6 *with* Pavlin Aff. ¶ 3.F (convenience fees charged to Repossession Class accounts); Settlement Agreement ¶ 11.G.11 *with* Pavlin Aff. ¶ 3.K (interest payments in excess of 24% on Non-Repossession Accounts); Settlement Agreement ¶ 11.G.13 *with* Pavlin Aff. ¶ 3.M (convenience fees charged to Non-Repossession Accounts).

Mr. Pavlin averred, Pavlin Aff. ¶ 7 (emphasis added):

> [A]s a result of the adjustments that took place on or before July 22, 2011, certain credits were posted to the accounts of potential Class Members. <u>Each credit was treated as if the customer had made a payment in that amount on that day.</u> With regard to accounts that were still active at July 22, 2011, the effect of this credit on a given account depended upon status of the account at the time of posting, and the payment history on the account. Plaintiff, through counsel, pointed out recently to Westlake's counsel that <u>the posting of a credit to an account as a customer payment might result in an allocation of a portion of the credit to accrued interest.</u> <u>Although the customer received the full benefit of the credit as a payment on the customer's outstanding balance, Class Counsel stated that such an effect was inconsistent with the description in the Settlement Agreement that certain of the credits were applied "to principal."</u> <u>Although Westlake believes it properly credited the accounts at issue</u> (i.e., those accounts still active at July 22, 2011) <u>and made the obligors on the accounts whole for all charges, Westlake offered to Class Counsel to reapply now the adjustment credits</u>

---

new vehicle paid off the Westlake loan), because Westlake had not reprogrammed the software for the "special payment portal in the Westlake system" that was used to make such third-party payments. Pavlin Aff. ¶ 3.S. Mr. Pavlin averred that it reprogrammed its software to prevent future fees beings charged to either type of account and credited customers for these fees, *see id.*, and plaintiff has not contended that these fees and credits are relevant to the issues now before the Court. There was also a discrepancy between the Pavlin Affidavit and the Settlement Agreement as to the total amount of deficiency balances waived for members of the Repossession Class, *compare* Pavlin Aff. ¶ 3.G *with* Settlement Agreement ¶ 11.G.7, but Mr. Pavlin clarified in a subsequent affidavit that this discrepancy was the result of a typographical error in the Pavlin Affidavit. *See* ECF 39-4 at 1 n.1.

that were applied July 22, 2011 so that the entire credit is applied, effective as of July 22, 2011, to the amount financed balance that existed on that day. Westlake further offered to program its system so that even where the credit is re-posted as a pay down of principal, the payment due dates for the period after July 22, 2011, would be extended in the same fashion as if the credits were applied as a customer payment amortized to principal and interest. By making this revised adjustment, the credits provided to Westlake customers would be applied entirely to principal, as Class Counsel has asserted should have been done under the terms of the Settlement Agreement. By programming its system to extend payment due dates, Westlake's proposal also would have prevented the customer defaults that might otherwise occur as a result of the customer losing any credit for accrued interest that Westlake provided to the customer on July 22, 2011. On April 13, 2012, Plaintiff, through counsel, advised Westlake's counsel that Plaintiff did not accept Westlake's offer to modify the adjustments to resolve the perceived inconsistency. . . .

On May 18, 2012, plaintiff filed the Motion to Vacate. Additional facts will be presented in the Discussion.

## Discussion

The gravamen of plaintiff's argument is that the Preliminary Approval Order must be vacated because the Settlement Agreement approved by that order was predicated on Westlake's misrepresentation of what it had done to cure the alleged CLEC violations during the Cure Period. There is no dispute that Westlake applied several hundred thousand dollars' worth of credits to the accounts of potential class members during the Cure Period, in the amounts represented. Nevertheless, although Westlake stated in the Settlement Agreement that it had "re-classified" payments of convenience fees and excess interest "to principal," the parties agree that what Westlake actually did was to apply credits as if a cash payment was made to the outstanding balance on each account on July 22, 2011. Depending on whether outstanding interest was owed on a given account at that time, some amounts of the credits on some accounts were allocated to outstanding accrued interest, rather than all to principal.

It is important to observe that the parties agree that the alleged misrepresentation does not affect all of the members of the plaintiff classes, nor does it pertain to the amount paid by Westlake. In particular, it has no effect on at least three groups of plaintiff class members, consisting of the Repossession Class and two subsets of Non-Repossession Accounts within the Interest Rate/Fee Class: the Charged-Off Accounts and accounts as to which the loans had already been repaid in full before July 22, 2011. This is because Westlake waived all interest (not merely all interest in excess of 24%) as to the Repossession Class, waived all deficiency balances with respect to the Charged-Off Accounts, and there were no outstanding balances with respect to accounts that had already been paid in full. Thus, as to these three groups of class members, all of the credits that Westlake provided either went only to pay outstanding principal or were paid directly to the account holders in the form of checks.

Westlake has identified 2,084 accounts (just over two thirds of the total of 3,056 accounts held by members of the plaintiff classes) that are affected by the alleged misrepresentation, *i.e.*, that were active on July 22, 2011, when the adjustments were made, and that had credits posted in part to customer obligations other than principal reduction. *See* ECF 39 at 9. As to those 2,084 accounts, a total of $359,653.28 was applied in credits and, of those credits, $216,044.61 (approximately 60%) was applied to reduce principal and $143,608.67 (approximately 40%) was applied to obligations other than principal, including interest. *See id.* Westlake has provided a chart, *see* ECF 39-7, showing the total amount of credit awarded to each of the 2,084 affected accounts and how much of each credit was applied to principal instead of other obligations.

As noted, by its own terms the Settlement Agreement is governed by Maryland law. The parties agree that, under Maryland law, a settlement agreement "is a contract between two parties

which is conditioned upon the court's acceptance of its terms." *In re Blessen H.*, 392 Md. 684, 715 n.6, 898 A.2d 980, 999 n.6 (2006). Thus, "'[s]ettlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts,'" and, "'[a]s long as the basic requirements to form a contract are present, there is no reason to treat such a settlement agreement differently than other contracts which are binding.'" *Erie Ins. Exchange v. Estate of Reeside*, 200 Md. App. 453, 461, 28 A.3d 54, 58 (2011) (citations and some internal quotation marks omitted). In Maryland, "settlement agreements are desirable and should be binding and enforceable." *Chernick v. Chernick*, 327 Md. 470, 481, 610 A.2d 770, 775 (1992). "The policy of encouraging settlement is so important that, even when the parties later discover that the settlement may have been based on a [unilateral] mistake, settlement agreements will not be disturbed." *Nationwide Mut. Ins. Co. v. Voland*, 103 Md. App. 225, 237, 653 A.2d 484, 491 (1995).

Nevertheless, Maryland law provides that "an unintentional 'material misrepresentation of fact . . . may warrant rescission by a Court . . . of a contract induced thereby,'" including a settlement agreement. *Creamer v. Helfstay*, 294 Md. 107, 116, 448 A.2d 332, 337 (1982) (so stating, in context of settlement agreement, but reversing trial court's rescission of settlement agreement where alleged oral misrepresentation was contradicted by express terms of written contract). However, "rescission will be decreed only upon proof of a justifiable reliance on a material misrepresentation." *Chesapeake Homes, Inc. v. McGrath*, 249 Md. 480, 488, 240 A.2d 245, 249 (1968). And, when "the misrepresentation is made without scienter or fraudulent intent, the element of materiality must be clearly established." *Id.* at 488, 240 A.2d at 250.[12]

_____

[12] To the extent that the matters are governed by federal law rather than Maryland law,

The Maryland Court of Appeals has explained, *id.* at 488, 240 A.2d at 249 (quoting *Carozza v. Peacock Land Corp.*, 231 Md. 112, 121, 188 A.2d 917, 921 (1963)):

> "In a business transaction, reliance upon a misrepresentation of fact, intentionally misrepresented or otherwise, is justifiable only if the fact misrepresented is material. A fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction, or the maker of the misrepresentation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it."

As an initial matter, Westlake makes some attempt to argue that its description of the credits as applied "to principal" was not actually a misrepresentation, because the phrase "to principal" was not defined in the Settlement Agreement and so, Westlake claims, it "is not clear whether principal is meant to mean the amount financed under the loan contract or the customer's outstanding balance or both." ECF 25 at 12. This claim holds no water. Maryland courts adhere to the "objective theory of contracts," by which, "'[w]hen the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning . . . .'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 233-34, 60 A.3d 1, 22 (2013). In the financial context, the ordinary and usual meaning of "principal" is the "capital sum, *as distinguished from interest or profit*." RANDOM HOUSE COLLEGE DICTIONARY at 1053 (rev. ed. 1980) (emphasis added); *see also* BLACK'S LAW DICTIONARY at 1312 (9th ed.

---

federal decisions are to similar effect. *See, e.g.*, *Ohio Valley Envir. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009) ("Settlement agreements operate on contract principles, and thus the preclusive effect of a settlement agreement 'should be measured by the intent of the parties.'") (citation omitted); *Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 540 (4th Cir. 2002) (stating that "resolution of a motion to enforce a settlement agreement draws on standard contract principles," although "it may be accomplished within the context of the underlying litigation without the need for a new complaint"); *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 828 (4th Cir. 1999) ("'[A] "false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity'" or an action for damages in a court of law.").

2009) (definition of "principal" as "[t]he amount of a debt, investment, or other fund, *not including interest, earnings, or profits*") (emphasis added).[13]   Especially in the context of a simple-interest loan, in which interest is not compounded,[14] the meaning of the term "principal" unambiguously excludes interest.

It is clear that Westlake misstated the way in which it applied the credits to the accounts. Nevertheless, plaintiff does not contend that Westlake's misrepresentation was intentional.  The question remains whether Westlake's misrepresentation was material.

The materiality of the misrepresentation has two aspects.  First, whether what Westlake actually did has a materially different financial impact from the relief provided by Westlake to the plaintiff classes as represented in the Settlement Agreement.   And second, whether what Westlake actually did during the Cure Period, as compared to what Westlake represented that it had done, has a material effect on the amount of relief to which the plaintiff classes could claim entitlement because it would negate a safe harbor defense by Westlake.  I will consider these matters in turn.

The parties disagree as to the financial difference between the relief as represented and the relief actually provided by Westlake.  As of April 20, 2012, Westlake calculated the total financial difference as approximately $22,500, which represented interest at the rate of 24% per

---

[13] To ascertain the plain meaning of contractual terms, Maryland courts often look to dictionaries.  *See, e.g.*, *B & P Enters. v. Overland Equip. Co.*, 133 Md. App. 583, 616, 758 A.2d 1026, 1043 ("We may also look to a dictionary to construe the words of a contract."); *Consumers Life Ins. Co. v. Smith*, 86 Md. App. 570, 575, 587 A.2d 1119, 1122 (1991) ("The Court of Appeals has consulted *Webster's Dictionary*, *Random House Dictionary*, or, less often, *Black's Law Dictionary* to determine the ordinary and accepted meaning of a word.").

[14] As noted, loans under CLEC must be effectively simple-interest loans.  *See* C.L. § 12-1003(a) ("The rate of interest chargeable on a loan must be expressed in the agreement as a simple interest rate or rates.").

annum on the amount of each credit to a class member's account that was applied to something other than principal, from July 22, 2011 (the date of the credit) until either April 20, 2012 or the date that the loan was paid off or charged off, if earlier. The $22,500 sum included various amounts for the 2,084 affected accounts, ranging for each account from only a few cents to just under $100. Westlake's theory supporting this calculation is that, if each credit had been wholly applied to pay down principal, each account holder would not have accrued 24% interest on the additional principal amount that was paid down. According to Westlake, in the context of a settlement valued in total at nearly $3 million (including the Settlement Fund and all waivers and credits either applied to class members' accounts or paid to the class members), a misrepresentation amounting to a discrepancy of approximately $22,500 (*i.e.*, 0.75% of $3 million) cannot be considered material. Westlake also states that it remains willing to reallocate the payments to principal as represented in the Settlement Agreement, backdated to July 22, 2011, thus eliminating the $22,500 discrepancy.

Plaintiff disputes Westlake's calculation. According to plaintiff, the "minimum financial impact" caused by Westlake's misrepresentation as of April 20, 2012 totals over $166,000, "but is likely much larger." ECF 40 at 14 (emphasis omitted). Plaintiff arrives at this number by adding the approximately $22,500 in "interest avoidance" calculated by Westlake to the $143,964.29 in overcharged interest and fees that were credited to class member accounts but were applied to something other than principal; according to plaintiff, the approximately $144,000 should also be considered because this sum was "supposed to be applied toward paying down principal," but "was not used for the intended purpose." ECF 40 at 14. But, plaintiff maintains that this amount understates the total financial effect of the discrepancy because

application of the payments toward principal on July 22, 2011, would have meant that a greater proportion of the account holders' subsequent monthly payments would have been applied to principal, resulting in earlier loan payoffs and less interest accruing over the remaining life of each loan. In addition, plaintiff argues that Westlake's estimation of the size of the discrepancy relative to the total value of the settlement is inapt, because Westlake is comparing apples to oranges. As plaintiff sees it, the misrepresentation only affects 2,084 members of the plaintiff classes, not including the Repossession Class, the Charged-Off Accounts, or accounts that were paid off as of July 22, 2011. By plaintiff's calculation, approximately $2.1 million of the total relief provided for in the settlement applies to class members other than the 2,084 affected accounts. *See* ECF 40 at 17-19. Thus, comparing her estimate of over $166,000 as the minimum financial impact of the misrepresentation on the affected accounts to the less than $900,000 total value of the settlement to the affected accounts, plaintiff contends that the misrepresentation totals nearly one fifth of the total value of the settlement to the affected class members and thus is material. *See* ECF 40 at 19-20.

In my view, neither side's calculation of the financial impact of the misrepresentation accurately captures the effect of the misrepresentation, and there is insufficient information in the record to enable the Court to perform the correct calculation. I disagree with plaintiff that the approximately $144,000 in misapplied credits should be included in the calculation because if that amount is reallocated to principal, as Westlake represented in the Settlement Agreement, the class members will receive the full benefit of those funds. Moreover, even as originally allocated by Westlake, the $144,000 in credits were applied to lawful interest charges that the class members actually owed. In other words, it is undisputed that the affected 2,084 accounts

received the benefit of the $144,000 in credits; the question is how the credits were applied to the accounts and whether the manner of application makes a difference. Westlake concedes that it makes at least $22,500 worth of difference. I agree with plaintiff, however, that Westlake's calculation neglects the potential effects of earlier pay-down of principal with respect to subsequent accrual of interest and earlier payoff of the accounts of the class members; the Court would need more detailed information than Westlake has provided regarding the status of each account as of July 22, 2011 and thereafter in order to calculate the full financial effect of the misrepresentation. And, to the extent that the materiality of the misrepresentation depends on the magnitude of its financial effect, I agree with plaintiff that it is relevant to compare the financial effect on the 2,084 affected accounts with the total benefits of the settlement to those 2,084 affected accounts. But, to obtain a full picture of the effect of any misrepresentation, the magnitude of the misrepresentation should also be considered in the context of the total financial value of the settlement to all class members.

Nevertheless, I do not see a need at this juncture to calculate the true financial impact of the misrepresentation on the relief provided. This is because, if the only matter at issue were the financial impact of the misrepresentation on the relief provided, the appropriate remedy for the plaintiff class would not be to vacate the Settlement Agreement, but rather to enforce it. Westlake represented, as a term of the Settlement Agreement, that it had applied the credits to principal and, from the Court's perspective, Westlake is required to do exactly as it represented it would do and had done. As noted, Westlake has stated that it will reallocate the credits at issue to principal if ordered to do so by the Court. I intend to so order. Because I do not necessarily agree with Westlake that its $22,500 calculation fully represents the financial impact of the

misallocation of the credits, Westlake will likely need to provide plaintiff and the Court with additional information regarding the affected accounts in order to ensure that the effects of Westlake's misrepresentation are fully corrected. But, because requiring Westlake to comply fully with the terms of the Settlement Agreement would obviate the direct financial impact of the misrepresentation and eliminate any argument to vacate preliminary approval of the Settlement Agreement stemming from that financial impact, I need not further address that issue in order to resolve the Motion to Vacate.[15]

Plaintiff argues that Westlake's misrepresentation is material for a second reason: the misrepresentation affects the viability of Westlake's safe harbor defense. Simply enforcing the terms of the Settlement Agreement would not resolve this issue because this issue does not concern what Westlake promised to do. Rather, it concerns what Westlake actually did during the Cure Period, which has now passed.

As noted, CLEC imposes a strict penalty upon the credit grantor for statutory violations, *i.e.*, forfeiture by the credit grantor of its right to collect any sums other than principal. But, CLEC provides a safe harbor defense, by which the credit grantor can avoid this penalty for an unintentional, good faith violation, so long as the credit grantor "[c]orrects the error or violation *and makes the borrower whole for all losses*" within *ten days after notice of the violation*. C.L. § 12-1018(a)(3)(ii) (emphasis added). According to plaintiff, Westlake's application of credits to interest and other obligations, rather than principal, during the Cure Period, was not sufficient to "[c]orrect[ ] the error or violation and make[ ] the borrower[s] whole for all losses," *id.*, within

---

[15] Westlake should be prepared to present the Court, in the context of a motion for final approval of the settlement, with more detail as to how the credits were applied to class members' accounts, both originally and in correction of its misrepresentation.

the meaning of CLEC. Plaintiff insists that Westlake cannot belatedly take advantage of the Cure Period; even if Westlake were to correct the misapplication of the credits now, the Cure Period has passed. If plaintiff's interpretation of the safe harbor provision is correct, Westlake would not have qualified for the safe harbor defense, and thus would be liable to the class members for all sums other than principal that Westlake had ever collected as to the affected accounts. Thus, the 2,084 affected account holders' recoverable damages would include *all* of the interest and fees they had paid over the life of the loans, not merely the illegal fees and interest payments in excess of the statutory 24% limit.

Once again, there is not sufficient information in the record to calculate the amount of recoverable damages under this theory. At a minimum, one would need to know the entire amount paid over the life of each affected loan to obligations other than principal. But, it is safe to assume that the amount is orders of magnitude higher than the relief that the Settlement Agreement would provide to the 2,084 affected account holders.

Plaintiff maintains that if she had known during the negotiation of the Settlement Agreement how Westlake had actually applied the credits, as opposed to how it represented that it had applied them, she would not have settled on the terms that she did, because she would have concluded that Westlake's potential safe harbor defense was far weaker than it appeared. In response, Westlake argues that, by applying the credits as it actually did, *i.e.*, to outstanding balances of the affected accounts, rather than solely to principal, it fully "[c]orrect[ed] the error or violation and [made] the borrower[s] whole for all losses" within the meaning of C.L. § 12-1018(a)(3)(ii). Westlake reasons that each class member received the full monetary amount of the credits that were agreed upon, regardless of what portion of the credits were allocated to

principal.  Moreover, Westlake argues that invalidation of the Settlement Agreement on this ground would provide a disincentive for credit grantors to attempt to cure violations and bring themselves within CLEC's safe harbor.

There is no extant case law in the Maryland state appellate courts, in this district, or from the Fourth Circuit interpreting CLEC's safe harbor provision.  Nor have the parties directed the Court's attention to any case law interpreting analogous statutes in other jurisdictions.  Whether applying credits to pay down principal is necessary to come within CLEC's safe harbor is very much an open legal question.  The parties have extensively briefed the issue, including a detailed analysis of CLEC's statutory history, in an attempt to persuade the Court to resolve the issue.  However, given the procedural posture in which the issue arises, I conclude that it would be inappropriate for the Court to decide this legal issue of first impression in order to resolve the parties' dispute.  I shall explain.

The parties negotiated the Settlement Agreement on the basis of the uncertain state of the law at the time of their negotiations, in the context of the factual information then known to each party.  Each side evaluated the legal strength of its position and the position of its opponent and the amount of each side's potential recovery or liability.  They did so taking into account the likelihood of victory or defeat and the inherent risks of litigation, one of which was the unclear state of the law as to the safe harbor defense under CLEC.

Moreover, the viability of Westlake's safe harbor defense was far from the only unknown.  Several other issues were subject to substantial litigation risk, including novel questions of law as to the legality under CLEC of the convenience fees charged by Westlake and

the adequacy of the notices related to repossession sales that Westlake provided,[16] and other potential defenses to the claims of the proposed plaintiff classes or the viability of the case for class treatment. "The choice to settle implicitly acknowledges calculated risks and, in the end, reflects the deliberate decision of both parties to opt for certainty in terminating their litigation." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010). To decide the materiality of a misrepresentation in a settlement agreement by resolving an issue of law that was disputed and uncertain at the time the settlement agreement was made would give the parties exactly what they bargained to avoid by settling their suit. Rather than resolve the parties' uncertainty as to the law, what the Court must do is determine whether Westlake's misrepresentation was material at the time of the settlement negotiations, in light of the legal uncertainty that then existed. As noted, a misrepresentation "'is material if [the] existence or non-existence [of the misrepresented fact] is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction,'" or where "'the maker of the misrepresentation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it.'" *Gross v. Sussex Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1162 (1993) (quoting *Carozza*, *supra*, 231 Md. at 121, 188 A.2d at 921).

---

[16] The legality of the convenience fees remains unresolved. After the Settlement Agreement in this case was achieved, the same counsel who represents plaintiff here litigated issues regarding notice of repossession sales that are similar to the issues here, on behalf of a different client, in another putative class action against a different credit grantor. *See Bediako v. American Honda Finance Corp.*, 850 F. Supp. 574 (D. Md. 2012). In *Bediako*, Judge Roger W. Titus decided the issue against the plaintiff and concluded that, in the context of a private sale, CLEC does not require the information related to repossession sales that the plaintiffs in *Bediako* and in this case contended were required. Judge Titus's decision in *Bediako* is now pending on appeal to the Fourth Circuit; the case was argued on May 14, 2013.

The precise nature of what Westlake actually did during the Cure Period in order to cure the alleged CLEC violations was undoubtedly relevant to the potential viability of Westlake's CLEC defense. Moreover, given the stringent nature of the penalties for violation of CLEC, the viability of the safe harbor defense significantly affected the amount of the plaintiff classes' potentially recoverable damages. And, the parties expressly agreed in the Settlement Agreement that plaintiff "relie[d] upon [Westlake's] representation[s]" as to its actions during the Cure Period in agreeing to the settlement. Settlement Agreement ¶ 11. In sum, plaintiff has a non-trivial argument that the misrepresentation was material.

I need not resolve whether the misrepresentation was material, however, because even assuming *arguendo* that it was, I cannot grant plaintiff's Motion to Vacate. If this were not a class action, the materiality of the misrepresentation might be the end of the analysis. However, the Court has already preliminarily approved the Settlement Agreement as a settlement of the claims of two plaintiff classes. In the class action context, Fed. R. Civ. P. 23(e) requires a district court to review the proposed settlement of a class action to determine whether it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "The purpose of Rule 23(e) is to protect the unnamed members of the class. Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members." *Ehrheart*, *supra*, 609 F.3d at 593 (internal citation omitted). As I see it, the Court must consider its fiduciary obligations to the class members in determining whether to vacate the Preliminary Approval Order. "To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation." ANNOTATED MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.61 at 487 (2011).

The federal courts have enumerated several factors to guide trial courts in this assessment. "By far the most important factor is a comparison of the terms of the proposed settlement with the likely recovery that plaintiffs would realize if they were successful at trial." *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 8 (D.D.C. 2006); *accord Pigford v. Glickman*, 206 F.3d 1212, 1217-18 (D.C. Cir. 2000) ("The district court's role in reviewing the decree is to protect the interests of absent class members, and that is done primarily by evaluating the terms of the settlement in relation to the strength of their case.").

The Fourth Circuit has articulated several factors relating to both fairness and adequacy. *See In re Jiffy Lube Securities Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991). With respect to fairness, the *Jiffy Lube* Court enumerated four factors: "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the [relevant] area of . . . class action litigation." *Id.* at 159. As most relevant here, the *Jiffy Lube* Court provided five factors with respect to adequacy, *id.* (emphasis added):

> (1) the *relative strength of the plaintiffs' case on the merits*, (2) the *existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial*, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

Other circuits have articulated similar factors. In *Vasalle v. Midland Funding, LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (citation omitted), the Sixth Circuit enumerated seven factors to consider in determining whether a class action settlement is fair, reasonable, and adequate:

> "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class

representatives; (6) the reaction of absent class members; and (7) the public interest."

The *Vasalle* Court also said that a court "'cannot judge the fairness of a proposed compromise without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.'" *Id.* (citation and some internal quotations omitted). In short, it is clear that a court presented with a class action settlement must consider "'the likelihood of success on the merits.'" *Id.* (citation omitted).

In light of this Court's fiduciary responsibility to protect the interests of the members of the preliminarily certified classes, there are several reasons warranting denial of plaintiff's Motion to Vacate.

First, Westlake's misrepresentation has no effect upon approximately one third of the members of the plaintiff classes, including the Repossession Class, the obligors of the Charged-Off Accounts, and those obligors whose accounts were already paid off as of July 22, 2011. To scuttle the Settlement Agreement would serve only to harm those class members, because the relief to which they are entitled is not even arguably affected by Westlake's misrepresentation.

Second, there have been intervening legal developments since the Settlement Agreement was executed that might redound to the detriment of several class members and could result in a windfall benefit to Westlake if preliminary approval of the Settlement Agreement were vacated. In particular, in *Bediako v. American Honda Finance Corp.*, 850 F. Supp. 2d 574 (D. Md. 2012), authored by another judge in this district after the parties in this case executed their Settlement Agreement, the district court concluded, as a matter of law, that a credit grantor who sells repossessed collateral at a private sale, as opposed to a public sale, is not required under the CLEC to disclose in advance the date, time, and place of the sale to the debtor. *See id.* at 583-85.

In this case, plaintiffs' claims on behalf of the Repossession Class are premised, at least in part, on the proposition that such disclosures are required in advance of private sales. To be sure, *Bediako* is pending on appeal to the Fourth Circuit, which may take a different view of the CLEC's requirements than did the district court. But, as the decisional law currently stands, if the Settlement Agreement were vacated now, *Bediako* would counsel that the Repossession Class's claims are in large part not viable. As noted, a substantial proportion of the dollar value of the relief provided for in the Settlement Agreement is attributable to the Repossession Class. In negotiating the Settlement Agreement before *Bediako* was decided, the parties chose to avoid the risks of litigation in favor of a comprehensive settlement. Vacating the Settlement Agreement cannot return the parties to the *status quo ante*. Rather, it would result in Westlake obtaining "something for nothing": an intervening district court decision deciding a previously unresolved legal issue in defendant's favor.

Third, as noted, I must consider the plaintiff classes' likelihood of success. To be sure, vacating the Settlement Agreement would afford the 2,084 affected class members the opportunity to pursue more expansive relief. If plaintiff is correct that a credit grantor must apply unlawful overpayments solely to principal in order to bring itself within CLEC's safe harbor, then the 2,084 affected class members might potentially be entitled to a much greater recovery, in the form of repayment of all amounts other than principal paid to Westlake over the life of each loan. But, the Court must consider not only the size of the potential recovery but also the realistic likelihood that such a recovery could be obtained. And, critically, I cannot conclude that there is a substantial likelihood of success in any greater measure than is already offered by the Settlement Agreement.

Notably, there is no judicial precedent or other authoritative construction of the CLEC's safe harbor provision that endorses either side's interpretation of the statute. Plaintiff has presented an argument for her interpretation that is based on the legislative history of the CLEC and a comparison of its text to the different text of related statutes, but her argument is far from ironclad. Indeed, although it would not be appropriate for me to resolve the merits of the parties' dispute as to the meaning of the CLEC's safe harbor provision, I am dubious of the validity of plaintiff's interpretation. To be sure, it is clear that it makes a difference (to the tune of at least $22,500) whether the waivers are applied to the principal obligations of the 2,084 affected accounts or, instead, their outstanding account balances. But, as of July 22, 2011, the date that the credits were applied, that difference was entirely prospective: as of that date, the parties appear to agree that the amount of the credits was sufficient to "make[ ] the borrower[s] whole for all losses" that had then occurred. C.L. § 12-1018(a)(3)(ii). The difference lies in how much interest would accrue *after* the Cure Period. Certainly, I cannot say that it was clearly established, either at the time of the Cure Period or at the time the Settlement Agreement was negotiated, or even still today, that application of credits to a borrower's principal obligation, as opposed to the borrower's outstanding balance, is required in order to come within CLEC's safe harbor.

Moreover, even if plaintiff's interpretation of C.L. § 12-1018(a)(3)(ii) is correct, there are other potential roadblocks to recovery by at least some members of the plaintiff classes, if the Preliminary Approval Order were to be vacated. The Settlement Agreement itself provides that, according to Westlake, the "obligors on at least 1,023 of the credit accounts identified as potentially within one or both Classes for purposes of this Settlement Agreement could have

arguably been excluded from the Classes due to legal defenses regarding arbitration clauses and statute of limitations." Settlement Agreement ¶ 11.F. Moreover, Westlake asserts that it would vigorously litigate the question of whether the classes should be certified for litigation purposes on the ground that individual issues predominate, and likewise would litigate whether Ms. McDaniels remains a proper class representative, given that Westlake contends it has made her whole for all losses. *See* ECF 39 at 24. Although these matters have not been briefed by the parties in enough detail for me to determine how substantial an impediment to the litigation they would present, they clearly would raise a non-trivial hurdle to recovery by the classes, in the absence of the Settlement Agreement.

For all of the foregoing reasons, I am compelled to deny plaintiff's Motion to Vacate.[17] Given Westlake's promises, however, as set forth in the Settlement Agreement, Westlake is required to comply with its obligations under the Settlement Agreement, as represented. These include retroactive application of the credits to principal and waiver of additional interest that accrued to the affected accounts as a result of Westlake's application of the credits to outstanding account balances, rather than to principal. As noted, Westlake has averred that it stands ready to comply. I will direct it to do so in the Order that accompanies this Memorandum Opinion.

In denying the Motion to Vacate, the Court is bound by its duty to protect the interests of the classes. Although the individual members of the classes were not obligated to accept the original Settlement Agreement, no class members had objected in the time initially provided, and

---

[17] Nevertheless, plaintiff was entitled to rely on Westlake's representations, and even if the misrepresentation was unintentional, Westlake should have made its representations with more care. If there were evidence of intentional misrepresentation, or if it were clear that what Westlake actually did was insufficient to bring it within CLEC's safe harbor, or if further recovery by the classes were less doubtful in the absence of the Settlement Agreement, my ruling might well be different.

only one class member opted out during the initial notice period. But, the class members were unaware of Westlake's misrepresentation. Individual class members are entitled to consider whether, notwithstanding the risks to their interests that impel the Court not to vacate preliminary approval of the Settlement Agreement, discussed *supra*, it is in their interest to seek a greater recovery by opting out of the settlement and pursuing an individual claim against Westlake. With knowledge of the misrepresentation as to what Westlake did during the Cure Period, an affected member of the plaintiff classes might conclude that Westlake's safe harbor defense is sufficiently weak, and the potential recovery so substantial, that it is worth the litigation risk to pursue an individual claim against Westlake. As discussed, *supra*, I am dubious of plaintiff's interpretation of CLEC's safe harbor provision, but resolution of the merits of the safe harbor defense is not before me, and each class member is entitled to make his or her own decision as to whether to opt out of or object to the settlement, on the basis of notice that contains accurate information regarding the "class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(2)(B)(iii).

A judge is empowered to "require notice to correct misinformation or misrepresentations made by one of the parties or by parties' attorneys." ANNOTATED MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.313 (2011). Moreover, "[t]hose who made the misstatements should bear the cost of a notice to correct misstatements." *Id.* Accordingly, Westlake shall be required to pay the cost of additional notice to the class members, in a form to be proposed by the parties and approved by the Court, of the misrepresentation and the fact that, notwithstanding the misrepresentation, the Court has elected not to vacate the Preliminary Approval Order. In addition, the class members will need to be notified as to a new date for a final fairness hearing.

The costs of such additional notice shall be paid by Westlake, in addition to the amounts it has contributed to the Settlement Fund, and shall not diminish the value of the Settlement Fund.

Therefore, it is premature to consider final approval of the settlement until renewed notice to the class members has been accomplished. All other pending motions will be denied, without prejudice to renewal, pending accomplishment of such notice and the establishment of a new date for a final fairness hearing. An Order implementing my rulings follows.


Date:   June 7, 2013                          _____/s/_____
                                              Ellen Lipton Hollander
                                              United States District Judge