IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ASHLEY McDANIELS,
on her own behalf and on behalf of
all others similarly situated,

    *Plaintiff*,

    v.

WESTLAKE SERVICES, LLC,
d/b/a Westlake Financial Services, *et al.*,

    *Defendants*.

Civil Action No. ELH-11-1837

## MEMORANDUM OPINION

The Court held a class action fairness hearing on February 7, 2014, to consider final approval of a settlement in regard to a suit initiated by plaintiff Ashley McDaniels ("Named Plaintiff") against defendant Westlake Services, LLC, d/b/a Westlake Financial Services ("Westlake"). At the hearing, the Court heard comments from counsel for the parties.[1]

Now pending are several motions filed by Class Counsel, including a "Motion to Grant Final Approval of Settlement" (ECF 67); a "Second Motion to Approve Cy Pres Award" (ECF 64); a "Second Petition for Incentive Award to the Named Class Representative" (ECF 65); and an "Application for an Award of Attorney's Fees and Expenses" (ECF 66).[2] Prior to the hearing, the parties submitted a "[Proposed Joint] Final Order and Judgment Approving Settlement and

---

[1] Two class members—Edward Henry and Randolph Williams—attended the hearing to observe. They were invited to speak, but had no comments for the Court's consideration.

[2] In response, Westlake filed the following: "Defendant Westlake's Response to Plaintiff's Second Motion to Approve *Cy Pres* Award" (ECF 69); "Defendant Westlake's Response to Second Petition for Incentive Award to the Named Class Representative" (ECF 70); "Defendant Westlake's Response to Class Counsel's Application for an Award of Attorney's Fees and Expenses" (ECF 71); and "Westlake's Memorandum in Response to Plaintiff's Motion for Final Approval of the Class-Action Settlement" (ECF 72).

Certifying Settlement Classes" (ECF 73; modification in original). After the hearing, minor revisions were made to the proposed final order. *See* ECF 76 ("Final Order and Judgment Approving Settlement and Certifying Settlement Classes"). None of the motions are contested.

## I. Background

In July 2011, McDaniels filed a class action suit against Westlake Services.[3] Westlake was plaintiff's creditor with respect to a Retail Installment Sale Contract ("RISC") that Ms. McDaniels executed in 2009 to finance the purchase of a motor vehicle from a used car dealership in Baltimore, Maryland. Complaint ¶¶ 30-32. The motor vehicle was collateral for the loan. The RISC was assigned to Westlake. Ms. McDaniels contended that Westlake unlawfully charged her convenience fees and interest at a rate of 25%, in excess of the maximum rate of 24% permitted by Maryland law. She also claimed that, after she fell behind in her loan payments, the vehicle was unlawfully repossessed in 2010, in violation of The Credit Grantor Closed End Credit Provisions ("CLEC")[4] of the Maryland Credit Deregulation Act of 1983, codified, as amended, at Md. Code (2005 Repl. Vol., 2012 Supp.), §§ 12-1001 *et seq.* of the Commercial Law Article ("C.L."). Westlake sent Ms. McDaniels a pre-sale notice informing her that the motor vehicle would be sold unless she redeemed it by paying the amounts past due on her loan. Complaint ¶ 43. However, plaintiff alleged that the pre-sale notice did not state the location, date, or time at which the vehicle would be sold. *Id.* ¶¶ 44-46. After Westlake sold Ms. McDaniels' motor vehicle, it sought unsuccessfully to collect a claimed deficiency balance from Ms. McDaniels. *Id.* ¶¶ 47-50. McDaniels alleged that Westlake also failed to provide statutorily

[3] Plaintiff also named the Law Offices of William R. Feldman, P.C. ("Feldman") as a defendant, but her claims against Feldman were settled and dismissed shortly after suit was filed. *See* ECF 10 (notice of settlement) & ECF 11 (dismissal order).

[4] The acronym "CLEC" stands for "CLosed End Credit."

compliant post-sale notices of claimed deficiency.

The Complaint (ECF 1) contained five counts directed against Westlake: violation of CLEC (Count I); breach of contract (Count II); violation of the Maryland Consumer Protection Act ("CPA") (Count III); restitution and unjust enrichment (Count IV); and violation of the Maryland Consumer Debt Collection Act ("MCDCA"), C.L. §§ 14-201 (Count V).[5]

By way of background, CLEC is one of several statutory schemes in Maryland that govern the extension of credit. Among other things, CLEC limits the rate of interest that can be charged on a covered loan to an "effective rate of simple interest [that] is not in excess of 24 percent per year," C.L. § 12-1003(a); it limits the types and amount of fees that can be charged to a borrower, *see* C.L. § 12-1005; and it establishes notice and other detailed procedural requirements for the repossession and sale of collateral. *See* C.L. § 12-1021.

In addition, CLEC imposes a stringent penalty for violation of the statutory scheme: "Except for a bona fide error of computation, if a credit grantor violates any provision of [CLEC] the credit grantor may collect only the principal amount of the loan and may not collect any interest, costs, fees, or other charges with respect to the loan." C.L. § 12-1018(a)(2). Moreover, if a credit grantor "knowingly" violates CLEC, the credit grantor is liable for treble damages. C.L. § 12-1018(b).

However, CLEC establishes a safe harbor for a credit grantor who promptly cures certain kinds of violations after receiving notice of the violations, including violations of the maximum

---

[5] Although the MCDCA count was denominated as "Count Five," it was actually the sixth count in the complaint. The MCDCA count was directed at both Westlake and Feldman. All of the other counts listed above were directed solely at Westlake. Another count, also denominated "Count Five," was directed solely at Feldman, and alleged violation of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.* As noted, plaintiff's claims against Feldman were dismissed, so the FDCPA count is no longer at issue.

interest rate provisions and fee provisions (although not the repossession provisions).  *See* C.L. § 12-1018(a)(3)(i) (enumerating CLEC provisions subject to safe harbor).  In the case of a failure to comply with the applicable provisions that is "[u]nintentional[ ] and in good faith," the penalty of forfeiture of all amounts other than principal does not apply, so long as the credit grantor "[c]orrects the error or violation and makes the borrower whole for all losses, including reasonable attorney's fees and interest, where appropriate, within 10 days after the credit grantor receives notice of the error or violation."  C.L. § 12-1018(a)(3).

Plaintiff proposed to conduct the case as a class action on behalf of two defined classes: a "Repossession Class," consisting of all persons whose consumer goods were repossessed by Westlake in connection with a credit contract governed by CLEC; and an "Interest Rate/Fee Class," consisting of all persons who entered into a credit contract with Westlake that was governed by CLEC and who were charged (1) interest at a rate exceeding 24% and/or (2) a convenience fee.  The FDCPA and MCDCA claims were brought only by Ms. McDaniels individually, and not on behalf of either proposed class.

Soon after the complaint was filed, the parties jointly requested an expedited settlement conference and a stay of further proceedings pending a settlement conference.  *See* ECF 8.  The Court granted the request, *see* ECF 9, and a settlement conference was conducted by Magistrate Judge Beth Gesner on October 5 and 6, 2011.  With her able assistance, settlement negotiations were initially fruitful and, on January 31, 2012, plaintiff filed a motion for preliminary approval of a class-wide settlement (ECF 14), memorialized in a Settlement Agreement dated January 19, 2012 (ECF 14-2).

Pursuant to the Preliminary Approval Order issued by the Court on February 6, 2012, and the terms of the Settlement Agreement, the Settlement Administrator provided notice by mail to the potential class members. The potential class members had until May 6, 2012, to object to or opt out of the Settlement Agreement. Of the 3,057 potential class member accounts (involving 3,565 individuals), 2,993 received notice. *See* ECF 21 at 2. In an affidavit submitted soon thereafter (ECF 21), an employee of the Settlement Administrator averred that, by the deadline, the Settlement Administrator had received one opt-out and no objections.

On February 6, 2012, Judge Benson E. Legg, to whom the case was then assigned, issued an "Order Preliminarily Approving Settlement, Certifying Classes for Settlement Purposes, Appointing Class Counsel and Settlement Administrator, and Setting Schedule with Respect to Notice, Settlement Hearing and Administration" ("Preliminary Approval Order") (ECF 15). Among other things, the Preliminary Approval Order preliminarily approved the parties' settlement agreement as "fair, reasonable and adequate, subject to further consideration thereof at [a] Fairness Hearing" to be held on June 14, 2012; it preliminarily certified for settlement purposes both the Repossession Class and the Interest Rate/Fee Class, pursuant to Fed. R. Civ. P. 23(b)(3); and it made provisions for notice to class members and an opportunity to opt out of the class and proposed settlement. Preliminary Approval Order at 1-2, 4-5, 6.

One month before the fairness hearing was to occur, plaintiff filed a Motion to Vacate the Preliminary Approval Order ("Motion to Vacate") (ECF 20), on the ground that new information, which had come to light in the course of "confirmatory discovery" provided by Westlake, undermined the basis for the settlement agreement. Shortly thereafter, and on the same basis, plaintiff filed a Motion in Opposition to Final Settlement Approval ("Motion Against

Final Approval") (ECF 22). Westlake opposed the Motion to Vacate, *see* ECF 25 & 30, and the Motion Against Final Approval, *see* ECF 27, and filed a Motion for Final Approval of Class-Action Settlement ("Motion for Final Approval") (ECF 26). The fairness hearing was postponed, *see* ECF 33, and the motions were briefed. The case was reassigned to me on October 24, 2012, due to Judge Legg's then-impending retirement.

Thereafter, in a Memorandum Opinion (ECF 49) and Order (ECF 50) filed June 7, 2013, I denied what were the then-pending motions.

## II. The Settlement Agreement

The Settlement Agreement of January 19, 2012, proposed to resolve the claims of plaintiff as well as a total of 3,056 class members who "arguably fall within one or both of the Classes." Settlement Agreement ¶ 11.A, at 3. Of the total 3,056 class members, 219 accounts came within the Repossession Class, and 3,050 accounts came within the Interest Rate/Fee Class, having been charged either a convenience fee or interest in excess of 24%. *See id.* ¶ 11.B-C, at 3. Of the 3,050 accounts in the Interest Rate/Fee Class, 2,837 accounts had not undergone repossession, and thus were not members of the Repossession Class; the parties referred to these 2,837 accounts as the "Non-Repossession Accounts." *Id.* ¶ 11.D, at 3. Of the Non-Repossession Accounts, 147 accounts had been "charged off" by Westlake on or before July 22, 2011, and were referred to as the "Charged-Off Accounts." *Id.* ¶ 11.E, at 3. Westlake also asserted that the "obligors on at least 1,023 of the credit accounts identified as potentially within one or both Classes . . . could arguably have been excluded from the Classes due to legal defenses regarding arbitration clauses and statute of limitations." *Id.* ¶ 11.F, at 3-4.

The Settlement Agreement recounted that Westlake had taken several steps during the Cure Period to attempt to cure the alleged CLEC violations and thereby bring itself within CLEC's safe harbor. The Settlement Agreement stated, *id.* ¶ 11.G at 2, 4-6:

> Westlake has represented, and [Ms. McDaniels] relies upon such representation, that:
>
> *   *   *
>
> Within ten (10) days of receiving service of process in the Action, Westlake, on its own accord and in an attempt to cure any alleged violations of the CLEC asserted in the Complaint, took the following actions on or before July 22, 2011:
>
> 1.  Westlake ceased using the allegedly defective pre-sale notice and post-sale accounting to cure the defects alleged in this Action.
>
> 2.  Westlake ceased charging convenience fees to Maryland consumers that entered into a credit contract governed by CLEC.
>
> 3.  Westlake ceased charging interest at a rate greater than twenty-four percent (24%) to Maryland consumers that entered into a credit contract governed by CLEC.
>
> 4.  Westlake waived all interest on Repossession Class credit accounts and credited all interest payments made, including the proceeds of the sale of collateral, to principal. The total of such interest payments re-classified to principal and waivers of unpaid interest was approximately $416,415.
>
> 5.  Westlake also credited each Repossession Class credit account with six percent (6%) interest from the date of each interest payment that was reclassified as principal. The total of the six-percent interest credited to Repossession Class credit accounts was approximately $197,835.
>
> 6.  Westlake waived all convenience fees charged to Repossession Class credit accounts, totaling $5,067, and reallocated those convenience fee payments toward principal. Westlake also credited Repossession Class credit accounts with six percent (6%) interest from the date of each convenience fee payment that was reallocated, resulting in additional credits of $671.
>
> 7.  In addition to the credits described in the preceding Sections . . . Westlake waived all outstanding balances and/or deficiencies that were owed in connection with the Repossession Class credit accounts. The total of the outstanding balances waived was approximately $453,304.

8. Westlake dismissed, with prejudice, any pending collection lawsuits against the Repossession Class obligors grounded upon an alleged deficiency or balance due with respect to any of those contracts.

9. Westlake also filed a request to vacate judgment in any case in which a judgment had been entered against any Repossession Class obligor.

10. Westlake mailed checks totaling $97,996.87 to Repossession Class obligors for overpayments by such obligors resulting from the above-described credits, reclassifications and waivers.

11. Westlake recalculated all of the Non-Repossession Accounts that exceeded twenty-four percent (24%) interest as if they were issued at 24%, which resulted in the reallocation of interest payments toward principal totaling approximately $377,280. This recalculation of the interest rate is also estimated to save Non-Repossession Account obligors an additional $400,000 in interest costs over the estimated life of the loans at July 22, 2011.

12. Westlake also credited all Non-Repossession Accounts with six percent (6%) interest from the date of each interest payment that was reclassified, resulting in additional credits totaling $25,637.

13. Westlake waived all convenience fees charged to Non-Repossession Accounts, totaling approximately $111,818, and reallocated those convenience fee payments toward principal.

14. Westlake also credited the Non-Repossession Accounts with six percent (6%) interest from the date of each convenience fee payment that was reallocated, resulting in additional credits of approximately $5,455.

15. Westlake mailed checks totaling $123,659.59 to obligors on the Non-Repossession Accounts for overpayments by such obligors resulting from the above-described credits, reclassifications and waivers.

16. Thus, the total amount of refund checks already issued to potential members of the Classes is approximately $221,656.

In addition to the foregoing relief, which Westlake represented it had performed during the Cure Period, the Settlement Agreement provided for the following relief for the classes: (1) it represented that, as of October 11, 2011, Westlake had waived all outstanding balances or deficiencies owed in connection with Charged-Off Accounts in the Interest Rate/Fee Class,

totaling $481,421 in waived balances; (2) it represented that Westlake had contacted the three major credit reporting agencies with respect to each of the accounts in the Repossession Class and the Charged-Off Accounts and "requested deletion of the trade lines relating to those credit accounts," and that Westlake would cooperate, within certain parameters, with any necessary further attempts by class members to delete properly a trade line from their credit reports; and (3) it provided that Westlake would pay the sum of $520,000 into a Settlement Fund, to be administered by a Settlement Administrator, the Casey Group, Ltd., subject to a modest increase per additional class member if the classes were found to be more numerous than expected, and additional funds in the amount of any refund checks that Westlake had issued to class members during the Cure Period but that had not been negotiated. Settlement Agreement ¶¶ 22.P-R, 24.F, at 18-20, 22.

Out of the Settlement Fund, the parties agreed that attorney's fees and expenses for Class Counsel would be paid in an amount approved by the Court and not in excess of one third of the "Total Settlement Fund";[6] the Settlement Administrator would be reimbursed for costs of notice and administration; and an incentive award in the amount of $5,000 would be paid to Ms. McDaniels. *See* Settlement Agreement ¶¶ 23, 43, at 20, 29-30. After those deductions, the remaining amount of the Settlement Fund would be divided equally and distributed by check among the number of eligible accounts the obligors of which had not opted out of the classes. *Id.* ¶ 24.A, at 20-21. The amount of any checks not negotiated after 120 days would be distributed

---

[6] The "Total Settlement Fund" was defined as the sum of the Settlement Fund plus all amounts previously distributed to the potential class members as refunds for overpayments resulting from credits applied to the accounts by Westlake during the Cure Period. *See* Settlement Agreement ¶ 16(z), at 12.

to a *cy pres* recipient; the parties proposed the Legal Aid Bureau, Inc. as the *cy pres* recipient. *See id.* ¶ 24.B-F.

Among other provisions, the Settlement Agreement also provided for "Confirmatory Discovery" by which Westlake would provide, within a certain time after the Court preliminarily approved the Settlement Agreement, a "sworn affidavit affirming the representations in [the] Settlement Agreement regarding actions taken by Westlake." Settlement Agreement ¶ 21.

On May 11, 2012, Westlake filed a Notice (ECF 17), in fulfillment of several requirements of the Settlement Agreement. The Notice stated that, on February 16, 2012, Westlake had paid $520,000 into the Settlement Fund held by the Settlement Administrator. In addition, the Notice recounted that on May 11, 2012, Westlake had paid into the Settlement Fund an additional $48,248.32, representing the total value of uncashed refund checks that Westlake had issued to account holders during the Cure Period.

There is no dispute that Westlake applied several hundred thousand dollars' worth of credits to the accounts of potential class members during the Cure Period, in the amounts represented. Nevertheless, Westlake stated in the Settlement Agreement that it had "re-classified" payments of convenience fees and excess interest "to principal," when Westlake actually applied credits as if a cash payment were made to the outstanding balance on each account on July 22, 2011. Depending on whether outstanding interest was owed on a given account at that time, some amounts of the credits on some accounts were allocated to outstanding accrued interest, rather than all to principal.

Westlake identified 2,084 accounts (just over two thirds of the total of 3,056 accounts held by members of the plaintiff classes) that were affected, *i.e.*, that were active on July 22,

2011, when the adjustments were made, and that had credits posted in part to customer obligations other than principal reduction. *See* ECF 39 at 9. As to those 2,084 accounts, a total of $359,653.28 was applied in credits and, of those credits, $216,044.61 (approximately 60%) was applied to reduce principal and $143,608.67 (approximately 40%) was applied to obligations other than principal, including interest. *See id.*

Following the Court's decision of June 7, 2013 (ECF 49), Westlake readjusted the 2,084 accounts in which part of the original credit had been applied to interest owed by the customer. ECF 54-1 ¶¶ 2-8. On July 8, 2013, Westlake reapplied the full credits to principal effective as of the date of the original credit, as stated in the Settlement Agreement, and credited any affected accounts where the reclassification from interest to principal benefitted the customer. *Id.* The total net benefit of all of the readjustments to the 2,084 accounts as of July 8, 2013, over and above the benefits bestowed by the original Westlake credits, was approximately $13,723.91. *See* ECF 54-1 ¶ 9, as corrected by ECF 55 ¶ 4. In some cases, customers whose accounts are paid in full will receive a small refund as a result of the readjustment. The sum total of these refunds will be $1,478.53, which will be made by Westlake through the Settlement Administrator. ECF 54-1 ¶ 9. Westlake provided the $1,478.53 to the Settlement Administrator for refunds on August 9, 2013. ECF 60 ¶ 4.

Further, Westlake provided Class Counsel and the Settlement Administrator with a class list that identified (a) the 2,084 accounts that were readjusted, (b) the net benefit to each account of the readjustment, (c) the amount of any refund that is due as a result of the readjustment, and (d) the status of each readjusted account at July 8, 2013 (*i.e.*, paid off, charged off or active). ECF 58 ¶ 1-2; ECF 60 ¶ 1-2.

The parties jointly proposed, and the Court approved, a second notice to the classes (ECF 61), which was mailed to the classes on September 6, 2013. ECF 63 ¶ 12. The notice included, *inter alia*, a description of (a) plaintiff's claims and Westlake's asserted defenses, (b) the inaccurate representation in the Settlement Agreement regarding the application of earlier credits on certain accounts, (c) the Court's decision denying the motion to vacate the preliminary approval order, (d) the effect of Westlake's readjustments of the credits to apply all credits to principal, (e) the new deadlines for objections and Opt-Outs, and (f) the date, time and location of the final approval hearing. ECF 61. Of the 3,057 class accounts, 2,907 (more than 95%) received the second notice, which the Settlement Administrator concluded "was a superior result considering the number of class members and the age of the transactions involved." ECF 63 ¶ 16.[7] The second notice provided a new deadline of November 5, 2013 for Opt-Outs and objections. ECF 61 at p. 6.

Prior to that deadline, the Settlement Administrator received only a single additional Opt-Out (*i.e.*, two obligors on a single account) and no objections to the settlement. *Id.* ¶¶ 18-19. Thus, after two notices and two opt-out and objection periods were furnished to the classes, the obligors on only two accounts have opted out and no class member has objected to the settlement.

The original value of the settlement, when made, was approximately $2,999,622. That amount included cash payments of $741,656.00, consisting of $221,656.00 in refund checks and

---

[7] ECF 63 indicated that 2,916 out of 3,057 accounts had received the second notice, but at the hearing on February 7, 2014, the parties indicated that, based on new information, the correct figure was 2,907 accounts. That difference is not material, and thus the Settlement Administrator's comments, which were based on the original figure of 2,916 accounts, apply with equal force to the adjusted total of 2,907.

an initial contribution of $520,000.00 to the Settlement Fund. *See* ECF 72 at 17 (quoting ECF 27 at 14-15; ECF 27-2 at 4-5). As a result of the re-adjustment of accounts, *see* Court's Order (ECF 50), Westlake made additional retroactive adjustments to accounts that had a benefit of $13,723.91 as of July 8, 2013 (ECF 55), of which $1,478.53 consisted of an additional cash payment to the Settlement Fund, for additional refunds to class members by the Settlement Administrator. ECF 54-1 ¶ 9; ECF 60.

Thus, the total estimated benefit to the classes as of July 8, 2013, was approximately $3,013,345.91 ($2,999,622 original benefit plus $13,723.91 readjustment benefit). This total benefit included $743,134.53 in cash payments consisting of $221,656.00 in original refund checks, the initial payment of $520,000 to the Settlement Fund, plus $1,478.53 in additional payments to the Settlement Fund to fund the readjustment refunds. Class members need not complete a claim form to obtain payment.

### III. Fairness of Settlement

Fed. R. Civ. P. 23(e) requires a district court to review the proposed settlement of a class action to determine whether it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "The purpose of Rule 23(e) is to protect the unnamed members of the class. Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) (internal citation omitted). "To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation." ANNOTATED MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.61 at 487 (2011).

The federal courts have enumerated several factors to guide trial courts in this assessment. "By far the most important factor is a comparison of the terms of the proposed settlement with the likely recovery that plaintiffs would realize if they were successful at trial." *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 8 (D.D.C. 2006); *accord Pigford v. Glickman*, 206 F.3d 1212, 1217-18 (D.C. Cir. 2000) ("The district court's role in reviewing the decree is to protect the interests of absent class members, and that is done primarily by evaluating the terms of the settlement in relation to the strength of their case.").

The Fourth Circuit has articulated several factors relating to both fairness and adequacy. *See In re Jiffy Lube Securities Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991).[8] With respect to fairness, the *Jiffy Lube* Court enumerated four factors, *id*. at 159:

> (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the [relevant] area of . . . class action litigation.

The *Jiffy Lube* Court also provided five factors with respect to adequacy, *id*.:

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*Jiffy Lube* Fairness Factors 1 and 2

The first two *Jiffy Lube* factors concern (1) the posture of the case at the time settlement was proposed, and (2) the extent of discovery that had been conducted.

---

[8] Although plaintiff analyzes fairness and adequacy under the criteria set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), as endorsed and adopted by the Fourth Circuit in *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173-74 (4th Cir. 1975). Although I will refer to the *Jiffy Lube* factors, the *Grinnell* factors, and plaintiff's application of those factors to this case, substantially overlap with the *Jiffy Lube* factors.

Here, the claims of Named Plaintiff were investigated and pending for almost three years to reach the resolution pending for approval by this Court. Were this case to proceed without settlement, litigation would surely continue for several more years.

The risks to both sides, as well as the anticipated complexity and costs of proceeding to trial, certainly favor settlement. The Supreme Court has recognized that the delay and risk of protracted litigation is a primary reason for counsel to recommend and the court to approve a settlement. *Protective Committee for Indep. Stockholders of TMT Trailer Ferry v. Brooks*, 390 U.S. 414, 424 (1968) (stating that a judge must consider "the [complexity], expense, and likely duration" of the litigation).

*Jiffy Lube* Fairness Factors 3 and 4

The next two *Jiffy Lube* factors address (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the [relevant] area of . . . class action litigation.

In his submissions, Class Counsel represents that he has many years of experience in class-action litigation. I note that Class Counsel has also litigated issues regarding notice of repossession sales that are similar to the issues here, on behalf of a different client, in another putative class action against a different credit grantor. *See Bediako v. American Honda Finance Corp.*, 850 F. Supp. 2d 574 (D. Md. 2012), *aff'd*, 537 F. App'x 183 (4th Cir. 2013). As for the negotiations, I note that this case included, among other discussions among the parties, a two-day settlement conference conducted by Magistrate Judge Beth Gesner in October 2011.

*Jiffy Lube* Adequacy Factors 1 and 2

Turning next to the adequacy factors, the first two factors focus on (1) the relative strength of the plaintiffs' case on the merits, and (2) the existence of any difficulties of proof or

strong defenses the plaintiffs are likely to encounter if the case goes to trial. In their filings, the parties have identified multiple potential barriers to recovery by the classes that warrant approval of the settlement. I will address only some of those possible barriers here.

For one, in *Bediako*, 850 F. Supp. 2d 574, Judge Titus concluded, as a matter of law, that a credit grantor who sells repossessed collateral at a private sale, as opposed to a public sale, is not required under the CLEC to disclose in advance the date, time, and place of the sale to the debtor. *See id.* at 583-85. So, he decided the issue against the plaintiff by concluding that, in the context of a private sale, CLEC does not require the information related to repossession sales that the plaintiffs here contend was required. Judge Titus's decision in *Bediako* was affirmed by the Fourth Circuit. *See* 537 F. App'x 183 (4th Cir. 2013). "The choice to settle implicitly acknowledges calculated risks and, in the end, reflects the deliberate decision of both parties to opt for certainty in terminating their litigation." *Ehrheart*, 609 F.3d at 593, 595.

In this case, plaintiff's claims on behalf of the Repossession Class are premised, at least in part, on the proposition that the disclosures at issue in *Bediako* are required in advance of private sales. *Bediako* would suggest that the Repossession Class's claims are in large part not viable. As noted, a substantial proportion of the dollar value of the relief provided for in the Settlement Agreement is attributable to the Repossession Class. In negotiating the Settlement Agreement before *Bediako* was decided, the parties chose to avoid the risks of litigation in favor of a comprehensive settlement.

Further, Westlake maintains that as many as 1,023 class members who will receive benefits under this Settlement Agreement "could have arguably been excluded from the Classes

due to legal defenses regarding arbitration clauses and statute of limitations."  ECF 14-2 at ¶ 11(F).

Plaintiff could also face further difficulties in trying this case as a class action because Westlake would litigate the issue of whether the classes should be certified for purposes of trial under Fed. R. Civil P. 23(b)(3), and whether plaintiff is a proper representative of the classes for litigation purposes because she has been made whole for all alleged losses.

Moreover, according to Westlake, the claims of the obligors on the Non-Repossession Accounts are completely barred for the additional reason that Westlake availed itself of the CLEC safe-harbor cure provision when it corrected the alleged errors and made all affected Maryland customers whole for all losses within ten days of receiving notice of the suit.  *See* ECF 17-1.

This settlement avoids the effect of all of these defenses and achieves a fair and adequate result without the need for prolonged and risky litigation. In entering the settlement, the parties recognized that there is no certainty in litigation and took account of the risks involved as well as the difficulties and delays inherent in such litigation and the likelihood of protracted appeals.

*Jiffy Lube* Adequacy Factor 3

The next factor, the anticipated duration and expense of additional litigation, also weighs in favor of approval.  Were this case not to settle, plaintiff would have to undertake a substantial amount of additional discovery; motions practice would include a motion to certify the classes. Trial preparation would require further effort and expense.  The classes would likely incur expenses related to experts, the cost of a third notice, and witness fees, among other expenses.

_Jiffy Lube_ Adequacy Factor 4

The parties agree that the fourth adequacy factor, which concerns the solvency of the defendant and the likelihood of recovery on a litigated judgment, is in this case a neutral factor. _See_ ECF 67 at 16-17; ECF 72 at 23.

_Jiffy Lube_ Adequacy Factor 5

The fifth _Jiffy Lube_ adequacy factor, the degree of opposition to the settlement, also counsels in favor of approving the settlement. The first notice to the classes was 98% effective, while the second notice was more than 95% effective. ECF 21 ¶ 9; ECF 63 ¶ 16. Moreover, in a class action with 3,057 Class Accounts, there were no objections to the Settlement Agreement and only two Class Accounts opted out of the Settlement Agreement. ECF 63 at ¶¶ 17-8.

In my view, the fairness and adequacy factors weigh squarely in favor of approval of the settlement.

## IV. Other Pending Motions

A. _Cy Pres_ Award

Class Counsel has also moved for approval of a _cy pres_ award resulting from the residue, if any, of the Settlement Fund. _See_ ECF 64 ("Second Motion to Approve Cy Pres Award"). The Settlement Agreement provides that any unclaimed settlement checks remaining in the Settlement Fund more than 120 days after distribution of payment shall be paid to a _cy pres_ recipient. The parties jointly proposed Legal Aid Bureau, Inc., which provides legal representation for the poor and under-represented in 13 locations throughout Maryland, as the _cy pres_ recipient. ECF 64 at 1.

The purpose of the equitable *cy pres* remedy is to benefit members of a class and the public, indirectly, when provision of a direct benefit is impossible or difficult to attain. When the proceeds of a damage award, settlement fund, or penalty cannot be returned directly to individual class members, it is appropriate for the court to distribute the funds to interested third-parties who will advance and promote the interests of the class. *See e.g. Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451 (D.C. Cir. 1996) (approving $4.8 million *cy pres* fund); *In re: Motorsports Merchandise Antitrust Litigation*, 160 F. Supp. 2d 1392 (D. Ga. 2001) (approving $2.4 million *cy pres* distribution in NASCAR price fixing case to 10 charities, including the American Red Cross and the Atlanta Legal Aid Society).

Courts have utilized *cy pres* distributions where, for instance, class members "are difficult to identify or where they change constantly," or where there are unclaimed funds. *Powell v. Georgia-Pac. Corp.*, 119 F.3d 703, 706 (8th Cir. 1997). "In these cases, the court, guided by the parties' original purpose, directs that the unclaimed funds be distributed 'for the indirect prospective benefit of the class.'" *Id.* (quoting 2 H. Newberg & A. Conte, Newberg on Class Actions, §§ 10.17 at 10-41 (3rd ed. 1992)). *See also* Shepard, *Damage Distribution in Class Actions: Cy Pres Remedy*, 39 U. Chi. L. Rev. 448, 452 (1972). As Judge Motz observed in *In re Microsoft Corp. Antitrust Litigation*, 185 F. Supp. 2d 519, 523 (D. Md. 2002), "the *cy pres* approach is most frequently used for the purpose of distributing the residue of a class settlement fund." *See also Superior Beverage Co. v. Owens-Ill., Inc.*, 827 F. Supp. 477 (N.D. Ill. 1993) (discussing the scope of the *cy pres* doctrine).

Maryland federal courts have approved *cy pres* awards in a number of settled class actions. In *Keneipp v. Fountainhead Title Group*, Civil Action No. 03-cv-02813-WMN (D. Md.)

(settled January 2006), for example, the United States District Court for the District of Maryland distributed more than $5,000 in *cy pres* awards, to two recipients, in a class action challenging an illegal kickback scheme perpetrated by a title company. In *Gray v. Fountainhead Title Group*, Civil Action No. 03-cv-01675-WMN (settled August 2004), the United States District Court for the District of Maryland approved nearly $100,000 payable to five *cy pres* recipients. Likewise, in *Clark v. Amerix Mortgage,* Civil Action No. 02-cv-2078-WMN (settled December 2002) and *Naughton v. Millennium Escrow and Title*, Civil Action No. 02-cv-3238-WMN (settled February 2003), consumer class actions challenging the establishment of "sham affiliated business arrangements," the Court approved nearly $100,000 in *cy pres* awards. *See also Brooks v. Condor Capital Corp.*, Civil Action No. 1:10-cv-01376-BEL (final approval January 2012) (approving Legal Aid Bureau, Inc. as a *cy pres* recipient) and Thomas v. CitiFinancial Auto Credit, Inc., Civil Action No. 1:10-cv-00528-JKB (final approval May 2012) (approving a *cy pres* award of $251,883.04 to Junior Achievement of Central Maryland, Inc.).

Here, Westlake does not oppose plaintiff's request that the Court approve Legal Aid as a *cy pres* recipient or plaintiff's request to allocate any residue from the Settlement Fund to the *cy pres* fund. Moreover, class members were notified by individual mailing that Class Counsel would request the Court approve the *cy pres* recipient and the allocation request. No class member objected to those proposed requests. *See* ECF 64-1 at 6-7.

The size of the *cy pres* fund is not yet known. The funds available for *cy pres* will be from those class members who are mailed a check and fail to negotiate the check within 120 days from the date of mailing. Class Counsel estimates that the *cy pres* fund will be small

considering that the Settlement Fund will be distributed without a claims process and because Westlake has already identified each class member entitled to Settlement Payments.

In light of the forgoing, I find that approval of the *cy pres* award is warranted. I therefore will grant ECF 64 ("Second Motion to Approve Cy Pres Award").

B. Award to Named Plaintiff

Class Counsel has also moved for this Court's approval of an incentive award of $5,000 for Named Plaintiff Ashley McDaniels, to be paid out of the Settlement Fund. *See* ECF 65 ("Second Petition for Incentive Award to the Named Class Representative").

Neither Westlake nor class members have opposed Named Plaintiff's request for a $5,000 incentive award. In my view, the requested amount is both reasonable and within the range approved by this and other courts. Accordingly, I will grant Class Counsel's "Petition for Incentive Award to the Named Class Representative," ECF 65.

The proposed incentive award of $5,000 for the Named Plaintiff represents less than 1% of the total value of the settlement in this case and less than 1% of the Settlement Fund to be distributed to class members. The Named Plaintiff cooperated extensively with Class Counsel and expended considerable effort to see this case through to settlement. She was required, *inter alia*, to provide documentation and information to Class Counsel, and to remain involved through settlement negotiations. ECF 65-1 at 1.

Judges of the United States District Court for the District of Maryland have approved $5,000 incentive payments for the named plaintiffs in a number of cases, including *Gray v. Fountainhead Title*, Civil Action No. WMN 03-cv-01675 (D. Md.) (settled 2004), *Naughton v. Millennium Escrow and Title*, Civil Action No. WMN 02-cv-3238 (D. Md.) (settled 2003), and

*Clark v. Amerix Mortgage,* Civil Action No. WMN 02-cv-2078 (D. Md.) (settled 2003), which were all common fund settlements.

Moreover, in class actions alleging similar violations relating to Maryland vehicle repossession, this Court has approved incentive payments similar to the one requested here for the Named Plaintiff. *Crowder v. Americredit Financial Services, Inc.*, Civil Action No. 1:06-cv-707-JFM (D. Md.) (settled July 2010) (approving $5,000.00 incentive award to class representative); *Vega v. SunTrust Bank*, Civil Action No. 1:09-cv-2815-PWG (D. Md.) (settled February 2011) (approving $6,000.00 incentive award to each class representative); *Muga v. Branch Banking and Trust Company*, Civil Action No. 1:10-cv-890-PWG (D. Md.) (settled August 2011) (approving $7,500.00 incentive award to class representative); *Watts v. Capital One Auto Finance, Inc.*, Civil Action No. 1:07-cv-3477-CCB (D. Md.) (settled January 2010) (approving $5,000.00 incentive award to class representative); and *Miller v. Prestige Financial Services, Inc.*, Civil Action No. 1:09-cv-1671-BEL (D. Md.) (settled November 2010) (approving $6,000.00 incentive award to class representative).

## C.  Attorneys' Fees

Class Counsel also moved for this Court's approval of an award of attorney's fees of thirty-three and one-third percent (33⅓ %) of the "common fund" settlement as of the time of submissions.  Thus, he seeks legal fees in the amount of $192.002.10, ECF 66 at 1.  He also seeks reimbursement of litigation expenses totaling $537.25.  *Id.*  No class members have objected.  ECF 66-1 at 4 ("The Class Notice specifically notified the Class that Class Counsel intended to apply for attorney's fees equal to 33⅓% of the Common Fund plus expenses and no

Class Members objected to this request.").[9]   As of the hearing on February 7, 2014, Class Counsel advised that the Settlement Fund had a balance of $576,306.83, but Class Counsel does not seek to alter the fee award.

Federal Rule of Civil Procedure 23(h), which governs attorneys' fees in the class action context, provides that a court may award "reasonable" attorneys' fees.   A court bears the responsibility to determine that fees are reasonable even in the absence of objections.   *See* Fed. R. Civ. P. 23(h), 1993 Advisory Committee notes.   As the Advisory Committee notes indicate, "[t]he agreement by a settling party not to oppose a fee application up to a certain amount . . . is worthy of consideration, but the court remains responsible to determine a reasonable fee."   *Id.*

The Committee Notes to Rule 23(h) indicate that a court may evaluate whether a fee award in a "common fund" case, such as this one, is reasonable based on either a percentage-of-recovery method or a lodestar method.   *See* Fed. R. Civ. P. 23(h), 1993 Advisory Committee notes.   Courts have favored the percentage-of-recovery method when the efforts of a particular plaintiff and his or her attorney create, discover, or increase a fund to which others also have a claim.   *See, e.g.*, *In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) (endorsing percentage-of-recovery method to calculate attorney fee award out of settlement fund in nationwide products liability class action); *see also* The Manual for Complex Litigation § 14.231 (4th ed. 2011) (reporting that "reporting that "the vast majority of courts of appeals now permit or direct district courts to use the percentage method in common-fund cases").   However, the lodestar method is

---

[9] Class Counsel has indicated that his intent was to seek one-third "of the amount of funds held by the Settlement Administrator on the day of the final approval hearing, based on payments received by the Settlement Administrator from Westlake to date, as well as any interest accrued thereon."   ECF 71 at 1-2.   Based upon that clarification, defendant advises that it does not oppose the application for attorneys' fees.   ECF 71 at 2.

also commonly used to calculate reasonableness. *See, e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("encourag[ing] the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage"). I am persuaded that, under either approach, the fee award is reasonable.

Class Counsel's work in this case was entirely contingent on its success; had plaintiff's claims failed, counsel would have received nothing. ECF 66-2 at 6-7. Class Counsel notes that the 33⅓ percent award of the settlement fund requested by Class Counsel in this case is in line with the awards approved by other judges of the United States District Court for the District of Maryland in consumer class actions settled with a common fund. ECF 66-1 at 8 (listing ten District of Maryland consumer class action cases with attorneys' fees of 33 percent). Particularly in light of the complexity of the case, the risk undertaken by counsel given the chance that plaintiffs would not prevail, and in view of the various factors considered with respect to the reasonableness of the settlement, such as the time devoted to litigating and settling, 33⅓ percent appears to be a reasonable percentage of the recovery in this case.

The lodestar calculation confirms the reasonableness of this award. The lodestar amount is calculated by multiplying "the number of hours reasonably expended on litigation . . . by a reasonable hourly rate." *Lopez v. Lawns 'R' Us*, Civil No. DKC 07-2979, 2008 WL 2227353, at *5 (D. Md. May 23, 2008) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The lodestar is assessed according to the twelve factors of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), which have been endorsed by the Supreme Court in *Hensley* and the Fourth Circuit in *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986). These factors are, *Lopez*, 2008 WL 2227353, at *5:

(1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill requisite to perform legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee or rates; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount in controversy and results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases.

Under the lodestar method and the *Johnson* factors, I am satisfied that the award of fees in this case is reasonable. The Declaration of Cory L. Zajdel, of Z Law LLC, dated December 11, 2013, states that as of that date, he had billed 510.3 hours in connection with this case. ECF 66-2 at 9. The Declaration further indicated that, at that time, Z Law expected to dedicate approximately 75 additional hours on tasks that relate to the hearing, work with the settlement administrator, and communicating with class members and the *cy pres* recipient. ECF 66-2 at 9-10. As of the fairness hearing held on February 7, 2014, Class Counsel indicated that he had dedicated more than 550 hours to this case.

Regarding the hourly rate, Mr. Zajdel states that his billing rate is $350 per hour. ECF 66-2 at 7-8. Further, he states that he has been a member of the Maryland bar since 2004. An hourly rate of $350 exceeds the reasonable rates for attorneys with similar experience, as set forth in Appendix B of the Court's Local Rules (providing for a rate of $225-300 for lawyers with 9-14 years of experience). However, I note that those rates found in the Guidelines "are intended solely to provide practical guidance," and thus are not binding. Moreover, Mr. Zajdel indicates that this hourly rate in a class action has been determined on one occasion, and in that instance, Judge Garbis of this Court approved his lodestar hourly rate at $350.00 in a Fair Credit Reporting Act class action. ECF 66-2 at 8 (citing *Stillmock v. Weis Markets, Inc.*, Civil Action No. 1:07-cv-1342-MJG (final approval Jul. 26, 2011)). Based on Mr. Zajdel's work on this case

and the amount he would recover from the common fund at a rate of 33⅓ percent, his attorneys' fee award would roughly equal his stated billing rate of $350 per hour.

The work performed by Mr. Zajdel as lead counsel included investigating the claims, framing the causes of action, researching, briefing, reviewing documents produced in discovery, and communications personally with about 10% of the members of the classes. He also conducted the settlement negotiations with counsel for Westlake, devised distribution options on behalf of the classes, researched and framed the proposed structure of the settlement, and drafted the settlement documents, as well as preliminary and final approval documents. ECF 66-2 at 5. In my view, the requested attorneys' fees are reasonable and warrant this Court's approval. Likewise, the request for costs and expenses of $537.25 is appropriate. In addition, I will approve the requested costs for the Settlement Administrator, as set forth in the accompanying Order.

In light of the foregoing, and because no objections have been made, I will grant Class Counsel's "Application for an Award of Attorney's Fees and Expenses" (ECF 66).

An Order and Judgment follow.


Date: February 7, 2014                                   _____/s/_____
                                                          Ellen L. Hollander
                                                          United States District Judge